JUDGE STEIN

'09 CIV 00884

Cardillo & Corbett
Attorneys for Plaintiff
MARTRADE SHIPPING & TRANSPORT GMBH
29 Broadway
New York, New York 10006
Tel: (212) 344-0464
Fax: (212) 797-1212
James P. Rau (JR-7209)

---------------------------------------x

MARTRADE SHIPPING & TRANSPORT GMBH,

Plaintiff,

-against-

EUROCONDAL SHIPPING S.A.,

Defendant.

---------------------------------------x

**ECF CASE**
**VERIFIED COMPLAINT**

Plaintiff, MARTRADE SHIPPING & TRANSPORT GMBH (hereinafter "Plaintiff"), by its attorneys, Cardillo & Corbett, as and for its Verified Complaint against the Defendant, EUROCONDAL SHIPPING S.A. (hereinafter "Defendant"), alleges upon information and belief as follows:

## JURISDICTION

1. This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 United States Code § 1333.

## THE PARTIES

2. At all material times to this action Plaintiff was, and still is, a business entity duly organized and existing under the laws of a foreign country, with an address at Jan-Wellem-Platz 3, 40212 Duesseldorf, Germany.

3. Upon information and belief, at all material times, Defendant was, and still is a foreign corporation or other business entity existing under the laws of a foreign country with an address at Cl Vila I Vila 19, 08004 Barcelona, Spain.

DEFENDANT'S BREACH OF CONTRACT

4. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-3 of this Complaint as if set forth at length herein.

5. Pursuant to a time charter party dated June 27, 2008, Plaintiff, as disponent owner, chartered the M/V TETEVEN (the "Vessel") to Defendant, for a time chartered round voyage of 40-45 days at the rate of US $15,350 per day (the "Charter Party"). A copy of the Charter Party is attached hereto as Exhibit 1.

6. The Vessel properly performed the voyage under the terms of the Charter Party.

7. Following redelivery of the Vessel to Plaintiff, Plaintiff submitted its Hire Statement to Defendant showing a balance due to Plaintiff of $115,646.03. A copy of the Hire Statement is attached hereto as Exhibit 2.

8. Despite Plaintiff's continuing demand, Defendant has failed and refused to pay the amount due and outstanding of $115,646.03.

9. In addition, under the terms of the Charter Party, Defendant was responsible to pay for any stevedore damage to the Vessel.

10. During the Charter Party the Vessel suffered stevedore damage.

11. The Vessel underwent repairs of the stevedore damage in Alexandria, Egypt, with the total time and cost for these repairs calculated to be in the amount of $29,761.65.

12. By reason of the aforesaid, Plaintiff has suffered damages in the amount of $145,407.68, so near as the same can be presently estimated, no part of which has been paid although duly demanded, and is entitled to interest, costs and attorneys' fees, as set forth below.

13. The Charter Party provides that any disputes arising under the Charter Party shall be referred to arbitration in London, England. English law is applicable under the Charter Party.

14. Plaintiff reserves the right to demand arbitration against Defendant pursuant to the terms of the Charter Party.

15. Interest, costs and attorney's fees are routinely awarded to the prevailing party by arbitrators in London pursuant to English law. As best as can now be estimated, the following amounts can be expected to be

recovered in the action.

| | | |
|---|---|---|
| A. | On the principal claim: | $145,407.68 |
| B. | Interest at 6% for 3 years: | $ 26,173.38 |
| C. | Arbitration fees and attorneys' fees: | $ 50,000.00 |
| TOTAL: | | $221,581.06 |

DEFENDANT NOT FOUND WITHIN THE DISTRICT

16. The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, property within this District and subject to the jurisdiction of this Court, held in the hands of garnishees including, but not limited to, ABN Amro Bank NV, American Express Bank, Bank Leumi, Bank of America, Bank of China, Bank of Communications Co. Ltd. New York Branch, Bank of India, Bank of New York, Barclays Bank, BNP Paribas, Calyon, Citibank, Commerzbank, Deutsche Bank, HSBC (USA) Bank, J.P. Morgan Chase, Standard Chartered Bank, State Bank of India, Societe Generale, UBS AG and/or Wachovia Bank, which are believed to be due and owing to Defendant.

17. Plaintiff seeks an order from this court directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the

Supplemental Rules of Certain Admiralty and Maritime Claims and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia*, any property of the Defendant held by the aforesaid garnishees for the purpose of obtaining personal jurisdiction over the Defendant and to secure Plaintiff's claims as described above.

**WHEREFORE**, Plaintiff prays:

A. That process in due form of law issue against the Defendant citing it to appear and answer under oath all and singular the matters alleged in the Complaint.

B. That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all tangible or intangible property in whatever form or any other funds held by any garnishee, including, but not limited to, ABN Amro Bank NV, American Express Bank, Bank Leumi, Bank of America, Bank of China, Bank of Communications Co. Ltd. New York Branch, Bank of India, Bank of New York, Barclays Bank, BNP Paribas, Calyon, Citibank, Commerzbank, Deutsche Bank, HSBC (USA) Bank, J.P.

Morgan Chase, Standard Chartered Bank, State Bank of India, Societe Generale, UBS AG and/or Wachovia Bank, which are due and owing to Defendant, in the amount of $221,581.06 to secure Plaintiff's claims and that all persons claiming any interest in the same be cited to appear and pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims answer the matters alleged in the Complaint.

C. That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeal thereof; and

D. That the Plaintiff has such other, further and different relief as the Court may deem just and proper.

Dated: New York, New York
January 30, 2009

CARDILLO & CORBETT
Attorneys for Plaintiff
MARTRADE SHIPPING & TRANSPORT GMBH

By: ______________________
James P. Rau (JR7209)

Office and P.O. Address
29 Broadway, Suite 1710
New York, New York 10006
Tel: (212) 344-0464
Fax: (212) 797-1212

**ATTORNEY'S VERIFICATION**

State of New York )
) ss.:
County of New York)

1. My name is James P. Rau.

2. I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3. I am a partner in the firm of Cardillo & Corbett, attorneys for the Plaintiff.

4. I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5. The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6. The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7. I am authorized to make this Verification on behalf of the Plaintiff.

James P. Rau

Sworn to before me this
30th day of January, 2009

NOTARY PUBLIC

TULIO R. PRIETO
Notary Public, State of New York
No. 02PR6070011
Qualified in Richmond County
Certificate Filed in New York County
Commission Expires February 19, 2010

# EXHIBIT

# 1

From : "TNS Shipping Ltd." <chart@tns-shipping.com>
To : operations@martrade-shipping.de
Date : Fri, 27 Jun 2008 18:59:25 +0300
Subject : MV TETEVEN-CLEAN RECAP

FROM: TNS SHIPPING ISO 9001:2000 CERTIFIED BY LLOYDS
PHONE + 359 56 841005, FAX +359 56 840299
COMTEXT A33BG958, E-MAIL:chart@tns-shipping.com
Home page: www.tns-shipping.com

Dirk-Olga/Sylvia

Pls find below amended clean recap of fixture
Thanks yr support for this new fixture

- Vessel :m/v Teteven - as described

SHIP'S NAME: TETEVEN
IMO NUMBER: 8915861
HEAD OWNERS: NAVIGATION MARITIME BULGARE
MANAGER: NAVIGATION MARITIME BULGARE
OPERATOR: NAVIGATION MARITIME BULGARE

FLAG: BULGARIAN
PORT OF REGISTRY: VARNA
With the Character of class: BR 100 A5 ICE 1 GENERAL CARGO

TYPE OF THE VESSEL: GENERAL CARGO VESSEL

INMARSAT TLX NR/IND: C(1)-420705710,C(2)-420705711
FLEET77: VOICE 761673422 , FAX: 761673428
GLOBE WIRELESS: LZDJ@GLOBEEMAL.COM
CALL SIGN/ MMS I: LZDJ/ 207057000

YEAR OF BUILD: 1990
LAST DRY DOCK: DEC 2005
NEXT DRY DOCK: MAY 2008
LAST SPECIAL SURVEY: DEC 2005
NEXT SPECIAL SURVEY: DEC 2010

GT/GRT: 7098
NR/NRT: 3205

BRITISH TONNAGE CERTIFICATE N/A

| PANAMA | GRT: | NRT: |
|---|---|---|
| SUEZ | GRT: 7693.71 | NRT: 5670.18 |

SUEZ PROJECTOR: NO

DEADWEIGHT CAPACITY: 8637

NON CARGO WEIGHTS DEDUCTED FROM THE 'DW' CAPCITY:

DEADWEIGHT CONSTANT: 150 T
ANTIHEELING SYSTEM - 240 T (Vessel to trade with Antiheeling system full)

UNPUMPABLE:
BALLAST 52 T (At Trim 1.5 Aft)
HFO 54 CBM (At Trim 0.0)
MGO 8 CBM (At Trim 0.0)

L.O.A.: 122.335
BREADTH: 20.00
MAX DRAFT ON SUMMER LOAD LINE: 8.13

DRAFT ON FULL BALLAST WATER:

1. WITH 10 PCT BUNKER - 3.86 M ; 5.63M

FRESH WATER ALLOWANCE: 172mm

| DRAFT SCALE [DM] | DEADWEIGHT [M.TS.] | [T/CM] |
|---|---|---|
| 36.00 | 748 | 16.27 |
| 38.00 | 1075 | 16.31 |
| 40.00 | 1403 | 16.37 |
| 42.00 | 1732 | 16.42 |
| 44.00 | 2062 | 16.48 |
| 46.00 | 2393 | 16.53 |
| 48.00 | 2725 | 16.58 |
| 50.00 | 3059 | 16.64 |
| 52.00 | 3393 | 16.70 |
| 54.00 | 3729 | 16.75 |
| 56.00 | 4067 | 16.85 |
| 58.00 | 4406 | 16.97 |
| 60.00 | 4748 | 17.11 |
| 62.00 | 5094 | 17.27 |
| 64.00 | 5443 | 17.43 |
| 66.00 | 5796 | 17.64 |
| 68.00 | 6153 | 17.88 |
| 70.00 | 6513 | 18.17 |
| 72.00 | 6882 | 18.39 |
| 74.00 | 7254 | 18.60 |
| 76.00 | 7629 | 18.79 |
| 78.00 | 8008 | 18.97 |
| 80.00 | 8391 | 19.15 |
| 82.00 | 8777 | 19.31 |
| 84.00 | 9166 | 19.47 |
| 86.00 | 9559 | 19.63 |

HEIGHT FROM KEEL TO MAST TOP: 40.80m

SUMMER LOADLINE FREEBOARD: 2262 mm

NUMBER OF HOLDS: 3
NUMBER OF HATCHES: 3

| HOLDS DIMENSIONS: | L | x | B | x | H |
|---|---|---|---|---|---|
| HOLD 1 | 10.50 | x | F-5.20 / A-11.40 | x | 3.95 m |
| TWD 1 | 14.00 | x | F-7.20 / A-14.50 | x | 5.50 m |
| HOLD 2 | 31.40 | x | 11.60 /15.50 | x | 4.58 m |
| TWD 2 | 31.50 | x | 17.50 | x | 4.85 m |
| HOLD 3 | 30.00 | x | 15.50 | x | 4.58 m |
| TWD 3 | 31.50 | x | 17.50 | x | 4.85 m |

TWEENDECK'S HATCH DIMMENTIONS:

| | | | |
|---|---|---|---|
| No.1 | 8.40 | x | 6.50 m |
| No 2 | 25.50 | x | 15.50 m |
| No 3 | 25.50 | x | 15.50 m |

CARGO HOLD'S HATCH DIMMENSIONS:

| | | | |
|---|---|---|---|
| No1 | 7.67 | x | 6.50 m |
| No2 | 25.40 | x | 15.50 m |
| No3 | 25.50 | x | 15.50 m |

| CAPACITY - | GRAIN | / | BALES (CBM) |
|---|---|---|---|
| HOLD 1 | 507 | / | 474 |
| TWD 1 | 823.8 | / | 807.7 |

HOLD 2 2215.6 / 2215.6
TWD 2+3 2684+2699 / 2643+2649
HOLD 3 2179.25 / 2179.2
TOTAL 11109.78 / 10 960.0

CAPACITY - (M2):

| | | |
|---|---|---|
| HOLD | 1 | 87 |
| TWD | 1 | 122 |
| TWD | 2 | 597 |
| HOLD | 2 | 472 |
| TWD | 3 | 598 |
| HOLD | 3 | 459 |
| | TOTAL | 2335 |

TANKTOP -15.0 t/M2
TWEENDECK - 3.66 t/M2 / TW1-4.31T/M2
HATCH COVERS -1.75 T/M2

SELFBLENDING WING TANKS CAPACITY GRAIN [M3] - NIL
CARGO BATTENS : NO
VSSL CAN LOAD CONCENTRATED ORES AT A HOLD INTERVAL: NO
MAX LOADING ON MAIN DECK T/M'2: 1.46 T/M2

NUMBER OF CARGO HADLING GEARS: 2 NOT COMBINABLE
TYPE: ELECTRO-HYDRAULIC OUTREACH: No1 - 8 M ; No 2 - 6 M
LOAD CAPACITY: 40.00 MT

NOT COMBINABLE
THE PROPER WORK OF CRANES GIVEN IN ATMOSPHERIC TEMP UP-TO 35 DEG CELSIUS

NR OF HATCHES SERVED BY ONE CRANE: 2
NR OF HATCHES SERVED BY TWO OR MORE CRANES: 1
NR OF CRANES FITTED WITH GRABS: NO

FLUCH DECK: NO

TYPE VENTILATION: EL. DRIVEN NON REVERSIBLE,SUCTION
-CARGO SPACES: ALL
-SERVICE SPACES: ALL
-ACCOMODATION SPACES PROVIDED WITH AIR CONDITIONER: ALL

LENGTH BETWEEN FORE END OF THE FIRST HATCH COAMING AND AFT END THE LAST HATCH COAMING: 69.0 M

LOCATION OF ENGINE ROOM & BRIDGE: AFT PART - STERN FRAMES No 9-39

LENGTH FROM FORE PART OF SUPERSTRUCTURE TO STERN: 32.9M

LENGTH BETWEEN FORECAST AND SUPERSTRUCTURE: 89.2 M

STRETCH BETWEEN BOARD AND HATCHCOAMING
FIRST: 3.00 M MIDDLE: 0.80 M LAST: 0.80 M

VSSL IS FITTED TO LOAD CEMENT: NO
VSSL IS CO2 FITTED
VSSL IS EQUIPPED WITH AUSTRALIAN LADDERS: NO
VSSL SEAWAY FITTED: NIL
VSSL LAKES FITTED : NIL
VSSL IS FITTED TO LOAD CONTAINERS: YES
VSSL COMPLY WITH I.L.F. REQUIREMENTS:

MAX LOADING ON TOP TANKS: 15 T/M2

VSL IS CONTAINER FITTED WITH FOLLOWING INTAKES:

MAX WEIGHT HOLDS FOR STACK
20' - 81.2 TS
40' - 122.0 TS

MAX WEIGHT UPPER DECK FOR STACK
20' - [illegible] TS
40' - 30.0 TS

AS PER AVAILABLE LASHING MATERIAL ON BOARD
MAX 384 TEUS - EMPTY
255 x 20'x 14 TS INCL REFRIGERATORS - 30 PCS

PANAMA FAIRLEAD:YES
MAIN ENGINE - TYPE: MAN & BW 8L35MC
BUILT IN: POZNAN, POLAND
YEAR: 1987

NUMBER OF MAIN ENGINES: 1 OUTPUT MTS /DAY /RW/:4472 KW

RECOMMENDED FUEL: IFO 180

IFO TANKS:
DBT 5 PORT - 322.27 CBM - ASSIGNED FOR LSFO
DBT 5 STBD - 330.10 CBM

VESSEL NOT FITTED AND EQUIPED WITH SEPARATE FUEL SYSTEM FOR

LOW SULPHER FUEL OIL. TIME FOR CHANGE FROM "HSFO" TO "LSFO" BASED ON "LLOYD'S CHANGE OVER CALCULATOR" AND DEPENDS ON SULPHUR CONTENT OF THE "LSFO", AND REMAINS IN DAILY TANKS.

TIME CHARTERERS TO SUPPLY FUELS OF SUCH SPECS AND GRADES TO PERMIT THE VESSEL ,AT ALL TIMES TO COMPLY WITH THE MAXIMUM SULPHUR CONTENT REQUIREMENTS OF ANY EMISSION CONTROL ZONE WHEN THE VESSEL IS ORDERED TO TRADE WITHIN THIS ZONE

MAIN ENGINE (RPM=200=CONST)

| | RPM200/SPEED/ | IFO DAILY CONS MTS /DAY | KG /HR |
|---|---|---|---|
| REGIME 1 | | | |
| BALLAST | 0.0 | 0.0 | 0.0 |
| LADEN | 11.2 | 16.0 | 667 |

WITH SHAFT GENERATOR IN SERVICE /NORMAL REGIME OF WORK/

| | | | |
|---|---|---|---|
| REGIME 2 | | | |
| BALLAST | 0.0 | 0.0 | 0.0 |
| LADEN | 11.0 | 14.4 | 600 |
| REGIME 3 | | | |
| BALLAST | 0.0 | 0.0 | 0.0 |
| LADEN | 9.8 | 12.0 | 500 |

* SPEED GRANTED IN GOOD WEATHER BEAUFORT SCALE WIND UP TO 4 AND SEA STATE/SWELL UP TO INCLUDING 3 . SEA WATER TEMPERATURES NOT EXCEEDING 26 DEG/CEL ,ON EVEN KEEL.

*USING OF SHAFT GENERATOR IN BAD WEATHER CONDITION TO BE TO MASTER'S DISCRETION.

CONSUMPTION MANOEUVRE
MAIN ENG.USUAL FUEL
HFO - IFO : 350 KG/HR MIX :-GO : 350 KG/HR 8.4 MTS/DAY

WHEN A FORTHCOMING REPAIR OVER MAIN ENGINE USES THE GO - 350 KGS/H

AUX.ENGINE CONSUMPTION (1,2,3) -GO : 105

-SEA CONSUMPTION /WITHOUT SHAFT GENER. GO 45

-MANOEUVRING (TWO) GO 2X50

-AIR CONDITIONS IN USE GO 62.5

-PORT CONSUMPTION GO 2 1

-CRANE IN USE GO 2X50

BEING AT ANCHOR AND IN PORT - ABT 2.5 MTS MGO PER DAY OF 24 HRS

AUX. BOILERS - IFO 35

AT SEA MGO 250 kgs/24 hrs

VESSLS HEATING IFO 35

MGO

1 DG-1.25 TS /24 HRS
2 DG-2.5 TS/24 HRS

UNPUMPABLE QTTIES
IFO: ABT 54 TS/EVEN KEEL
MGO-ABT 11.5 TS

*AS PER FOLL INTERNATIONAL STANDARDS

ISO 8217-1996 CIMAC
BS MA 100:1989
IFO 180 RME 25 E 25
RMF 25 F 25
GO DMA MGO

DAYLY FRESH WATER CONSUMPTION: 5.0 MIX: 0.0 GO: 0.0
CAPACITY OF F.W. TANKS: 188 MTS
CAPACITY OF BUNKER TANKS IFO: 638 M3
EVAPORATOR DAYLY CAPACITY: 4.0 MTS

VESSEL CAN, BUT NOT SUITABLE FOR LOADING BULK CARGOES IF S/F BIGGER THAN 0.75 CBM PER TON DUE TO:
1. EACH LOADING WHEN CARGO IS ABOVE THE TWINDECK LEVEL REQUIRES GREASE REMOVE AND CHEMICAL CLEANING OF THE COGGED RAILS AND TWINDECK MECHANISMS. THE OILY MIXTURES MUST BE COLLECTED AND DELIVERED ASHORE. CLEANING MUST BE DONE WITH SMALL QUANTITIES OF WATER NOT TO OVERFLOW THE BILGE TANK CAPACITY.

2. TWINDECK COVERS MECHANISM LIABLE TO DAMAGE IF BULK LOADED CONTINUOUSLY.

3. IF BULK LOADED ABOVE THE TWINDECK LEVEL, DUE/DEPENDS ON S/F AND ANGLE OF REPOSE OF THE CARGO, CONSIDER MIN 600 MTS OF BULK WILL NOT SEEP FROM ITS OWN GRAVITY AND WILL REMAIN FOR MANUAL/SHOVEL DISCHARGE OVER SIDE TANKS ANT OPENED COVERS IN THE TWINDECKS NO.2 AND 3.

4. DUE TO TYPE AND WAY OF DETECTION ALL SMOKE DETECTORS

IN THE TWINDECKS MUST BE ISOLATED FROM DUST, ALWAYS REMAINING IN NON DETECTING CONDITION (CONTRADICTION WITH "SOLAS"), LIABLE TO DAMAGE AND GETTING SOON INOPERATIVE.

ALL DETAILS ABT AND WOG
=======

- ALL negotiations and fixture to be kept private and confidential

- Acct Eurocondal Shipping Spain

- all subs lifted and vssl clean fixed

- Del: DLOSP 1 SP casablanca ATDNSHINC

- Lay/Can: 06.07.2008/11.07.2008 00:01-24:00 Hrs LT -

- 1 Time Charter ROUND VOYAGE
  timecharter period of 40-45 DAYS in Charterers' option, INTENDET LOADPORT CASABLANCA, SAGUNTO, GENOA, SETE, SETUBAL via safe port(s)/safe berth(s)/ safe anchorage(s) including multiple loading/discharging always afloat and always within I.W.L., in and out of geographical rotation
  INTENDED DISCHARGING PORTS: MALABO AND BATA
- 2 pieces of 52 ton each can be loaded and discharged by shore gear on deck at chrts time and expence in accordance with vsl strenght.
- other containers and machinery weight to be in accordance with vsl's cargo gear and vsl strengt

- Redely on d.l.o.s.p. SAGUNTO atdnshinc

- Area of Trading :
  ================

Trading exclusions (war risk insurance)

Trading always within I.W.L., always afloat via safe ports, safe berths, safe anchorages.

excluding St Lawrence, Cuba, Israel,,Iraque, Libya, Lebanon, Cabinda, Amazon River (but Belem and Vila do Conde allowed), Orinocco River trade permitted however deep sea pilot to be for Charterers account, Eritrea, Nigeria, cape Horn Transiting, Hudson Bay, Turkish occupied Cyprus, Syria, Somalia, North Korea, Pacific coast of Russia, any war risk area and any warlike zones any country where the U.N. decides to boycott or ban the trade, no direct trading between China and Taiwan and between Turkey and Cyprus, Mindanao, between the ports of Polloc Harbour and Mati incl.

Charterers are allowed to trade the vessel via Magellan Strait, however Charterers to cover full/entire pilotage/navigation charts at their cost/ expenses eventhough pilotage is non-compulsory but recommended only.

Iran and Siera Leone are allowed PROVIDED THAT
Security Guards to be as per ISPS Clause, however watchmen to be for Charterers account.

Vessel not be ordered to breach ice, to enter or leaving any ice port. Any time lost and extra expenses that may have occurred due that fact will be at Charteres responsibility/ account.

Charterers option to breach IWL 1/7/76 and Extra War Risks Listed Areas of Joint War Committee Hull War, Strikes, Terrorism and Related perils, but always against Owner's preliminary confirmation/agreement WHICH NOT TO BE UNREASONABLY WITHHELD and reimbursement of extra insurance premium according to the London Underwriters.

Should the vessel trade in an area for which the Owners' war risk insurance require additional premium, the resulting cost to the Owners of maintaining in force their war risk insurance cover and of any crew war bonus payment until the vessel leaves such an area to be for the Chatrerers' account, but in accordance with London scale. The Charterers are to reimburse the Owners for such premiums and bonus payments upon submission of invoices and supporting vouchers. Instructions of the Owners underwriters to be always followed.

Following Clause to apply for: for African Countries (excluding South Africa) and Yemen;Jordan,Pakistan and Myanmar and is valid for "all permissible cargoes under this Charter Party

****************************************************************************
On completion of discharging at any port called under this Time Charter

Party - Charterers to arrange vessel's departure without delay. Charterers undertake to hold Owners harmless against any claim/seizure etc. which may arise by the Receivers side or any third parties including Custom Office and/or Local Court Procedure for SHORTLANDED OR DAMAGED DURING DISCHARGING CARGO, detention and/or arrest thereof,Bank Guarantee,direct payment of the claimed amount to the Receivers.Vessel to remain always on-hire.
**************************************************************************

- Cargo Exclusions:

The vessel to be employed for carriage of mainly metal/steel, general cargo, bulk minerals, ores, concentrated, chemicals, non-dangerous, harmless, law full cargoes and containers. Deck cargoes, if any to be at Charterers'/
Shippers'/Receivers' risk and expenses. Bs/l to be marked accordingly

Charterers may carry up to 5 laden legs with bulk cargoes for the duration of the Charter, with Masters prior consent as to the exact bulk cargo. when loading bulk cargoes, then the tweendecks to remain open and chrts to cover all vital part of the tweendeck covers

All kind of grain cargoes or cargoes whose behaviour is similar to that of grain to be carried in accordance with SOLAS;Grain Code; Vessel's Stability Booklet;Local Regulations;;Local Authorities approved Cargo plan;
Master's cargo plan recomendations/requirements always to be followed.
Charterers are fully aware vessel is not Grain Fitted and bagging and/or strapping is required."

Cargo exclusions - the following cargoes are excluded from carriage:

asphalt, arms, ammunitions, acids, asbestos, black powder, bones, copra and/or his products, creosoted goods, bulk cement,clinker,calcium carbide and hipohloride, caustic soda, detonator, caps, direct reduced iron/iron ore briquettes, explosives of any kind, hides, fish meal,livestock, manioc and/or manioc pellets, scrap of all kinds, naphtha, nuclear and radioactive materials/products and/or waste, Niger seed, oil cakes, sponge iron/pre-reducted ~~iron ore pellets,~~ tar and/or it's products, turpentine,pitch,petcoke,petroleum or petroleum products,pyrites,sulphur, sunflower seed expellers and pellets, linseed expellers and pellets, seed cake, inflammable, dangerous and hazardous goods not corresponding to ships certificates.

Charterers are allowed to load all IMO cargoes according to valid vessel's certificate (except those stated above), of course provided vessel has the corresponding certificate.

Arms, ammunitions, explosives of any kind and etc remain in cargo exclusions clause

-Hire: USD 15.350 - daily inclot pd/pro rata, payable every 15 days in advance

- bunkers clause :
vessel to be delivered with abt 100-125 mton HS IFO ifo hs / abt 27 mton do LS IFO and abt 50-60 mton DO HS

chrts to bunker and pay for eastimated bunker for the round trip for their account. bunkerprices for delivery /redelivery to be agreed basis Gibraltar
- vessel to be redelivery with the abt smae qtty.
Any balance owners or chrtrs favour to be settled upon completion trip at the bunkers prices on the day of delivery. -

-Bills of Lading:

The Charterers are allowed to use their own Bill of Lading form respectively Liner Bills of Lading (CONLINE) in order follow the requirements of the liner trade.
In above case Charterers are to be inserted as CARRIERS in the Bills of Lading and same to be signed 'for and on behalf of the Carrier Eurocondal

Shipping'.

IN THE EVENT OF SUB CHARTER,ON BEHAL OF THE ACTUAL SUB CHARTERERS - CARRIER.IN WHICH CASE MESSRS EUROCONDAL SHIPPING TO REMAIN ULTIMATELY RESPONSIBLE AS HEAD CHARTERES

Charterers remain fully responsible for all consequences that might result from using such forms and Liner Bills of Lading

Charterers herewith confirm that in case of liner bills of lading issued all liner costs involved are for Charterers account and that such cost are being paid to the respective port timely and Agents to confirm same towards owners upon request.

For all other Bills of Lading (except Liner Bills of Lading) Charterers will use BIMCO/ASBA approved forms only. In these forms original Owners may be inserted as Carriers.

The Master is to sign Bill(s) of Lading for cargo as presented in conformity with Mate's Receipts. In case of remarks regarding condition of the cargo - Master to insert the remarks on Mates Receipts and Bills of Lading. Draft Bill(s) of Lading to be provided for Owners approval prior to be signed for which

Alternatively - the Master of the Vessel is also Navibulgar employee, who can deal with Draft Bs/l

No L.O.I. for Clean on Board Bill(s) of Lading accepted

Master and Owners can authorise Charterers or their Agents to sign Bill(s) of Lading in conformity with Mates Receipts.In case of remarks regarding condition of the cargo - Master to insert the remarks on Mates Receipts and same remarks to be inserted on Bill(s) of Lading. Draft Bill(s) of Lading to be provided for Owners approval prior to be signed. No L.O.I. for Clean on Board Bill(s) of Lading accepted

- Delivery of the Cargo & Change of Destination:

In case of non-availability of original Bills of Lading upon vessel's arrival at discharge port, the Owners to allow the discharge of the cargo against a Letter of Indemnity in Owners standard P&I wording which being signed by the Charterers Eurocondal Shipping only and Charterers Eurocondal Shipping assuming the full liability for such discharge.

For change of destination the same procedure to be followed as per above and against a Letter of Indemnity in Owners P&I wording signed by the Charterers Eurocondal Shipping only.

- owners confirm that the vessel is able to load a full cargo of steel products upto vessel's maximum deadweight capacity and in line with her tanktop strength

- Intermediate hold cleaning USD 450 Per hold for bulk/bagged/general cargo - (i.e. USD 1 350 for cargo loaded in 3 holds) per voyage including removal/disposal of dunnage and lashing material and/or other debris (but crew not to be invloved into discharging operations)

- ILOHC: USD 3 000 LPSUM incl removal of dunnage/disposal of dunnage and lashing materials and/other debris

- CVE: USD 1.300 per month (30 days) pro rata (Owners will arrange direct e-mail transfer between Vsl/Chrtrs)

- Supercargo - vict + accomodation : USD 15 Per Day

- Arbitration,GA - London, English Law

- Comm: 3.75pct ttl hr

- otherwise c/p as per owners btb c/p

==

end clean recap

Brgds/TNS

COPY

GERMA Chartering GmbH
Colonnaden 72
20354 Hamburg
Tel. 040 / 35 74 28 0
Fax 040 / 35 74 85 35
germa@shipnet.de

# Time Charter

**GOVERNMENT FORM**

*Approved by the New York Produce Exchange*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

**This Charter Party**, made and concluded in ............... ***Hamburg*** ............... ***13th*** . day of ......... ***May*** ............ ~~19~~***2008***

Between ***Navigation Maritime Bulgare, 1 Primorski Street, Varna*** ...............

Owners of the good ............... ~~Steamship/~~Motorship ............ ***"TETEVEN"*** ............... of ***description see Clause 70*** of ***7,098*** ............ tons gross register, and ***3,205*** ............ tons net register, ~~having engines of~~ ............... ~~indicated horse power~~ and with hull, machinery and equipment in a thoroughly efficient state, and classed ***BR 100 A5 Ice 1*** ............... at ***Bulgarian Register*** of about ***10,960 cubic meter*** ~~cubic feet~~ bale capacity, and about ............ ***8,637 metric*** ............ tons ~~of 2240 lbs.~~ deadweight capacity ~~(cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity, allowing a minimum of fifty tons)~~ on a draft of ***8.13 meters*** ~~feet~~ ............ ~~inches on~~ ***saltwater*** Summer freeboard, inclusive of permanent bunkers, which are of the capacity of about . tons of fuel, and ***shall be*** capable of steaming ***at all times during the currency of this Charter Party***, fully laden, under good weather conditions about ............... knots on a consumption of about ***see Clause 70*** tons ~~of best Welsh coal—best grade fuel oil—best grade Diesel oil,~~ now ***in drydock*** ...............

............... and ***Martrade Shipping & Transport GmbH*** ............ Charterers of the City of ***Düsseldorf*** ............

**Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for ~~about~~ ***a Time Charter period of about 5/6 months (about meaning plus/minus 15 days) in Charterers' option, worldwide trading via safe port(s), safe berth(s), safe anchorage(s) including multiple loading/discharging always afloat and always within Institute Warranty Limits, in and out of geographical rotation*** within below mentioned trading limits.

Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for the fulfillment of this Charter Party.

Vessel to be placed at the disposal of the Charterers, ~~at~~ ***on dropping last outward sea pilot Bourgas at any time day or night, Sundays and holidays included*** ............... ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5.~~ ***Owners confirm that the vessel is able to load a full cargo of steel products upto vessel's maximum deadweight capacity and in line with her tanktop strength.*** Vessel on her delivery to be ready to receive cargo with clean-swept holds and tight, staunch, strong, ***dry, free of smell, free of any cargo residue and free of rust to Charterers'/Shippers' surveyors' satisfaction*** and in every way fitted for the service, having water ballast, winches and donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchandise, ~~including petroleum or its products,~~ in proper containers, excluding ***see Clause 57*** ............... (vessel is not to be employed in the carriage of Live Stock, ~~but Charterers are to have the privilege of shipping a small number on deck at their risk, all necessary fittings and other requirements to be for account of Charterers),~~ in such lawful trades, between safe port and/or ports ~~in British North America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or Mexico, and/or South America~~ ............... ~~and/or Europe and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,~~

***worldwide trading within Institute Warranty Limits with lawful cargoes on/under deck (see Clause 59). Trading exclusions see Clause 59.*** ..........

..........

as the Charterers or their Agents shall direct, on the following conditions:

1. That the Owners shall provide and pay for all provisions, wages, ***luboils, fresh water wireless station and taxes*** and consular shipping and discharging fees of the Crew; shall pay for the insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water ***also for garbage removal and lubrication oil*** and maintain her class and keep the vessel in a thoroughly efficient state in hull, ***holds,*** machinery and equipment ***including hatch covers with all inspection certificates necessary to comply with current requirements at ports of call)*** for and during the service.

2. That ***whilst on hire*** the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, Pilotages, Agencies, Commissions, ***tax dues on cargo and/or freight, state and municipal taxes, canal dues,*** Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew ***or events for which Owners are responsible*** to be for Owners' account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this charter to be for Charterers account. ~~All other fumigations to be for Charterers account after vessel has been on charter for a continuous period of six months or more.~~

Charterers are to provide necessary dunnage ~~and shifting boards,~~ also any extra fittings requisite for a special trade or unusual cargo, but Owners to allow them the use of any dunnage ~~and shifting boards~~ already aboard vessel. ~~Charterers to have the privilege of using shifting boards for dunnage, they making good any damage thereto.~~

3. That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on board the vessel ***as per Clause 48*** ~~at the current prices in the respective ports, the vessel to be delivered with not less than~~ ..........~~tons and not more than~~ .......... ~~tons and to be re-delivered with not less than~~ ..........~~tons and not more than~~ ..........~~tons.~~

4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of ***- see Clause 66 -*** .......... United States Currency ~~per ton on vessel's total deadweight carrying capacity, including bunkers and stores, on~~ ..........~~summer freeboard, per Calendar Month,~~ commencing on and from the ***hour of the*** day of her delivery, as aforesaid, and at and after the same rate for any part of a ***day*** ~~month~~; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary wear and tear excepted, to the Owners (unless lost) ~~at~~ ***on dropping last outward sea pilot 1 safe port in Charterers' option within Continent Europe/Baltic/Mediterranean/Adriatic/Aegean Sea/Black Sea, always at any time day or night, Sundays and holidays included*** .......... unless otherwise mutually agreed. Charterers are to give Owners not less than ***15/10/5/3/2/1*** days notice of vessels expected date of re-delivery, and probable port.

5. Payment of said hire to be made ~~in New York in cash~~ in United States Currency ***in Owners' nominated Bank***, ~~semi-monthly~~ ***every 15 days*** in advance ***(see Clause Nos. 42 and 50)***, and for the last ~~half month~~ ***15 days*** or part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid ***(see Clause Nos. 42 and 50)*** ~~for the balance day by day, as it becomes due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers,~~ otherwise failing the punctual and regular payment of the hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Charterers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working day following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they to have the privilege of using vessel at once, such time used to count as hire.~~

Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, ***provided Owners' written confirmation has been given*** ~~by the Charterers or their Agents~~, subject to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application of such advances.

6. That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place that Charterers or their Agents may direct, provided the vessel can safely lie always afloat at any time of tide, ~~except at such places where it is customary for similar size vessels to safely~~

~~lie aground.~~

7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew, tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodations allow, Charterers paying Owners .............................. per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.

8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow, ~~and~~ trim ***and discharge*** the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading for cargo as presented, in conformity with Mate's or Tally Clerk's receipts ***(see Clause No. 54).***

9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on receiving particulars of the complaint, investigate the same, and, if necessary, make a ***prompt*** change in the appointments.

10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the rate of ***US$ 15.00*** ~~$1.00~~ per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally Clerks, Stevedore's Foreman, etc., Charterers paying ~~at the current rate per meal~~, for all such victualling ***(as per Clause 66).***

11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Charterers, their Agents or Supercargo, when required, with a true copy of daily ***engine and deck*** Logs ***in the English language***, showing the course of the vessel and distance run and the consumption of fuel. ***Charterers to be permitted to examine all the ship's certificates (or to photostat same) at any time upon request (see Clause No. 39).***

12. That the Captain shall use diligence in caring for ~~the ventilation of~~ the cargo ***including ventilation.***

13. ~~That the Charterers shall have the option of continuing this charter for a further period of~~ ..........................................................................................

..........................................................................................

~~on giving written notice thereof to the Owners or their Agents~~ .................... ~~days previous to the expiration of the first-named term, or any declared option.~~

14. That if required by Charterers, time not to commence before ***15.06.2008 00:01 hours local time*** ........................................ and should vessel not have given written notice of readiness on or before ***30.06.2008 24:00 hours local time*** ................................ ~~but not later than 4 p.m.~~ Charterers or their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness. ***Laycan to be narrowed down to a 5 days spread latest 7 clear working days prior to the first layday.***

15. That in the event of the loss of time from deficiency of men or stores, fire, breakdown or damages to hull, machinery or equipment, grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause ***whatsoever except those caused by Charterers' servants,*** preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence thereof, and all extra expenses shall be deducted from the hire ***(see Clause No. 50).***

16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas, Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the purpose of saving life and property ***(see Clause No. 46).***

17. ~~That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.~~ ***Any dispute of difference under this Charter Party shall be referred to London Arbitration as per BIMCO 1998 including the short form arbitration procedure for disputes upto US$ 50,000.00. This Charter Party is to be subject to English Law.***

18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Average contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel ***(see Clause 67)***.

19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and Crew's proportion. General Average shall be adjusted, stated and settled, according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~ York-Antwerp Rules ***1994*** ~~1924, at such port or place in the United States as may be selected by the carrier, and as to matters not provided for by these Rules~~, according to the laws and usages at the port ~~of New York. In such adjustment disbursements in foreign currencies shall be exchanged into United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in United States money.~~

~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or ships belonged to strangers.~~ ***Hire not to contribute to general average.***

Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.

20. ~~Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the cost of replacing same, to be allowed by Owners.~~

21. ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~

..............................................................................................................................................................................

..............................................................................................................................................................................

22. Owners shall maintain the gear of the ship as fitted, providing gear (for all ***cranes*** ~~derricks~~) capable of handling lifts up ***their maximum capacity in accordance with the description clause No. 70*** ~~to three tons~~, also providing ropes, falls, slings and blocks ***as on board***. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide ***sufficient electric light in all holds*** ~~on the vessel lanterns and oil~~ for night work, ***whenever required*** ~~and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense~~. The Charterers to have the use of any gear on board the vessel.

23. Vessel to work night and day, if required by Charterers, and all ***equipment*** ~~winches~~ to be at Charterers' disposal during loading and discharging; ***Owners will provide one gangway watchman from the crew, but if compulsory then same to be for Charterers' account (see Clause 37).*** ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen, deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned thereby.~~

24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels;

etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both of which are to be included in all bills of lading issued hereunder:

U. S. A. Clause Paramount ***(see Clause 84)***

This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

~~Both-to-Blame Collision Clause~~ ***(see Clause 84)***

~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.~~

25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be withdrawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the port or to get out after having completed loading or discharging. ***Any additional hull and machinery premium for breaking Institute Warranty Limits to be for Charterers' account and paid by Charterers against presentation of original vouchers.***

26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the navigation of the vessel, ***acts of pilots and tugboats and linesmen,*** insurance, crew, and all other matters, same as when trading for their own account.

27. A commission of ~~2 1/2~~ ***1.25*** per cent is payable by the Vessel and Owners to ***GERMA Chartering GmbH, Hamburg***
..........................................................................................................................................................................................
on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

28. An address commission of ~~2 1/2~~ ***3.75*** per cent payable to ...........***Charterers***.......................... on the hire earned and paid under this Charter.

***Rider Clause 29 to 92 inclusive as attached hereto, are deemed to be fully incorporated in this Charter Party.***

***New Jason Clause, New Both-to-Blame Collision, BIMCO Conwartime and BIMCO Law & Arbitration Clause 1998 to be deemed incorporated in this Charter Party.***

***THE OWNERS:*** ***THE CHARTERERS***

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

GERMA Chartering GmbH · Schiffsmakler COPY

Colonnaden 72
D-20354 Hamburg
Telefon: 040-35 75 66 0
Telefax: 040-35 75 66 35
Internet: germa@germa-chartering.com

**M/V "TETEVEN"**

**RIDER TO THE CHARTER PARTY DATED HAMBURG, 13th MAY, 2008**

CLAUSE 29
On arrival at first loading port the vessel's holds are to be clean, dry and free from rust and in all respects ready to load a full cargo. Time lost, should the independent surveyor/authority reject the vessel's load readiness, to be for the Owners' account. However, the Owners not to be responsible, if the vessel does not pass inspections for the next cargo. These inspections to be appointed by the Charterers for their time and account. The Charterers' option to request assistance from the crew for interim hold leaning against extra payment.

CLAUSE 30
The Charterers to have the option of redelivering the vessel unclean and Charterers to pay US$ 3,000.00 lumpsum with last hire including removal/disposal of dunnage and lashing material and/or other debris.

For intermediate hold cleaning Charterers to pay US$ 450.00 per hold for bulk/bagged/general cargo (i.e. US$ 1,350.00 for loaded cargo in 3 holds) per voyage including removal/disposal of dunnage and lashing material and/or other debris (but crew not to be involved into discharging operations).

CLAUSE 31
Owners to give the Charterers 15/10/5/3/2 days approximate notice and 24 hours definite notice of delivery.

For redelivery Charterers are to give Owners 15/10/5/3 days approximate notice of redelivery and 48/24 hours definite notice of redelivery with final port.

CLAUSE 32
No dry-docking to take place during the period of the Charter except in case of emergency and during the time so lost for deviation and dry-docking the vessel to be considered as off-hire and hire shall not be paid for the time lost and he cost of extra fuel consumed and any other extra expenses incurred shall be for the Owners' account.

After suspension of hire from any cause, vessel to be placed again at Charterers' disposal at the same port or position where hire was suspended. At Charterers' discretion the charter period can be prolonged with the total time the vessel was off hire under this Charter Party. When vessel is out of service, due to above or any other cause for a continued period of five days or longer Owners to give Charterers not less than five days notice for a re-entering the Charter. The above does not exempt the Owners from obligation to keep Charterers closely informed about the exact nature and accurate position or repair work, for completion of repairs and re-enter into Time Charter at frequent intervals. If the vessel has been off-hire for a total period of 15 days during the Charter Party Charterers have the option to cancel the balance of the Charter Party.

CLAUSE 33
Owners and Charterers to share equal 50/50, time and expense for on-hire and off-hire survey. Reports shall be prepared and signed by an independent surveyor appointed jointly by Owners and Charterers. Survey fees to be shared equally.

Bankverbindungen: Dresdner Bank AG (SWIFT DRESDEFF200) USD-Kto. 900011201 IBAN DE 46 2008 0000 0900 0112 01
Dresdner Bank AG (BLZ 200 800 00) EUR-Kto. 900011200 IBAN DE 73 2008 0000 0900 0112 00
Berenberg Bank (SWIFT BEGODEHH) USD-Kto. 05-16866 001 IBAN DE 37 2012 0000 0516 8660 01
Berenberg Bank (BLZ 201 200 00) EUR-Kto. 16866006 IBAN DE 70 2012 0000 0016 8660 06
Geschäftsführer: Gerd Jonuscheit, Norbert Zwikirsch · Eingetragen im Handelsregister Hamburg, HRB 37751
VAT Nr. DE118555227, St.-Nr. 74/838/01755

CLAUSE 34
Any damage caused by the stevedores during the period of this Charter Party shall be reported by the Master to the Charterers or their Agents in writing within 24 hours of the occurrence or as soon as possible thereafter, but latest when the damage could have been discovered by the exercise of due diligence. The Master shall do his best to obtain written acknowledgement by the responsible parties that caused the damage, unless the damage has been made good in the meantime.

Stevedoring damage affecting seaworthiness or the proper work of the vessel and/or her equipment shall be repaired without delay to the vessel after each occurrence in the Charterers' time and at their expense.

All damages which are to be repaired by Charterers and which are not fair wear and tear and do not affect the vessel's seaworthiness, are to remain for sub sequential repaid when vessel is to dock for Owners' account so that Charterers pay the actual cost of repairs, but not for the time used.

CLAUSE 35
The Charterers shall leave the vessel in seaworthy condition and with cargo on board, safely stowed to the Master's satisfaction between loading berth(ports and discharging berth/ports. Any expenses resulting there from shall be for Charterers' account and any time used shall count as on-hire time.

CLAUSE 36
The Charterers have the privilege of loading cargo on deck and on hatches at their risk and expenses in accordance and with sea practice and with the permissible cargo loading as per the shipbuilder's, stability and visibility and to Master's satisfaction. Any deck cargo is always subject to the Master approval in respect of the vessel's seaworthiness. All Bills of Lading concerning deck cargo to be claused carried on deck shippers' or Charterers' risk (as the case may be) and responsibility.

CLAUSE 37
Watchmen for the vessel, if required by the Master, to be for the Owners' account, unless it is compulsory to take watchmen from the shore in which case the same are to be for the Charterers' account and same to be agreed/arranged directly with the Master. See also Clause 59 for Iran and Sierra Leone trade.

CLAUSE 38
Cargo to be always loaded, stowed, carried and discharged in compliance with relevant local regulations and IMO requirements (see Clause 57).

CLAUSE 39
The vessel shall be capable, at all times during the currency of this Charter Party of steaming as per direction clause in good weather conditions for the purpose of this Charter Party. Good weather conditions are to be defined as weather conditions in winds speeds not exceeding Beaufort force 4 (four) and sea Douglas State 3 (three).

Charterers may in their option, and at their cost engage ocean routes, to monitor vessel's course, position, speed etc. in order to maximize vessel's performance. Master is to follow ocean routes suggestion concerning navigation but Master, at his reasonable discretion, may not follow suggested route in which case he has to detail in log book the reasons for departure from them. Deck log will always constitute accurate proof of vessel performance and will be binding of both parties, however, in case of consistent discrepancies, then ocean routes and ship's to be reasonable considered.

Should the vessel's average speed and consumption be more than 0.5 knots under the speed or 5 per cent over the consumption stated in the vessel's description, in good weather conditions calculated for a completed voyage, Charterers are at the liberty to calculate the longer time spend during navigation as well as the bunker consumed in excess, for the purpose of debiting Owners with same. Period during which vessel shall steam with weather conditions over force stated above, not to be considered for the purpose of calculating the vessel's speed.

Weather reports to be taken from vessel's deck log and from independent weather reports (Ocean Routes). In the event of consistent discrepancies between the two sources, Ocean Routes' reports to be taken as ruling.

CLAUSE 39 / CONTINUED
Ocean Routes' appointment to be made jointly on behalf of both Owners and Charterers with Ocean Routes reporting to both parties and Ocean Routes expenses for Charterers' account.

For the purpose of interpretation "ocean route" may be replaced by a "weather routing company" as Charterers may use "Marincom, Montreal" for example.

CLAUSE 40
Lashing, securing, dunnage and unlashing to be for Charterers' time and expenses. Lashing/unlashing of deck cargo could be done by crew at the Charterers' expenses and same to be agreed/arranged directly with the Master.

CLAUSE 41
All cargo to be loaded/carried and discharged under the Master's supervision and in accordance with the information of the vessel's strength and stability.

CLAUSE 42
Should the vessel be on her voyage towards the port of redelivery at the time when payment of hire due, Owners and Charterers or their agents may consider, as the estimated time necessary to complete the voyage.

When the vessel is redelivered any difference shall be refunded by the Owners or paid by the Charterers, as may be required, less any Owners' expenses and actual bunkers on redelivery.

CLAUSE 43
Basic war risk insurance and crew war bonus for worldwide trading to be for Owners' account. In the event the Charterers employ the vessel in a trade for which there is additional war risk insurance premium, the Charterers to pay such additional premium, actually paid by the Owners, but not to exceed the scale, published from time to time by the institute of London Underwriters.

If the Underwriters require payment of premium and/or calls because pursuant to Charterers order, the vessel is within, or is due to enter and remain within, any area or areas which are specified according to war risk trading, warranties 15/04/86 as excluded from the basic war risk cover and are subject to additional premium because of increased war risk then such premium and/or calls for extra war risk cover shall be reimbursed by Charterers to Owners at the same time as the next payment hire is due.

However, the basic war risk insurance premium to be for Owners' account. If Owners become liable into an area specified in war risk trading warranties 15/04/86 as excluded from the basic war risk cover, then such bonus or additional wages shall be reimbursed by Charterers to Owners at the same time as the next payment or hire is due.

CLAUSE 44
Cargo claims to be settled in accordance with New York Produce Exchange Inter Club agreement, as amended in May, 1984 and any subsequent amendments.

Owners agree that provided they are kept regularly advised by Charterers of all claims, settlements and extension of time, the Charterers may deal with and handle all cargo claims arising of charter voyage and without prior reference to Owners may settle cargo claims up to a limit of USD 1,000.- per claim and grant extensions of time as against Owners and Charterers in respect of all claims not yet time barred.
It is fully understood that as between Owners and Charterers that time limit for cargo claims (only) is two years.

CLAUSE 45
The vessel to work night and day or weekend/holidays, if requested by Charterers, and duly rigged by crew at all time as requested by the Charterers, all gear to be at the Charterers' disposal during loading and discharging the vessel to provide the crew to work day and night, also to open and close hatches, to remove and replace beams and hatch boards or pontoons, where so fitted, as required by the Charterers. All opening/closing of hatches to be done by crew, whenever required by Charterers. If the rules of the port or labour unions prevent the crew from opening or closing hatches, removing and replacing beams and hatch

CLAUSE 45 / CONTINUED
boards or pontoons, where so fitted, shore labour to be paid by the Charterers. In the event of disabled gear or insufficient power to operate gear, the Owners to pay for suitable substitute shore engine(s) and also for any stevedores standby time occasioned thereby but limited to one shift. Hire to be reduced proportionally to the total number of working hatches, for all time the gear is unavailable due to disability or loss of power.

CLAUSE 46
If during the period of this Charter Party is any deviation during the course of a voyage or any loss of time whatsoever caused by sickness of, or accident to the Master, or any member to their crew or any person on board the vessel, other than under Charterers' auspices, the vessel to be considered as off-hire and hire shall not be paid for time lost and the cost of extra fuel consumed until vessel is in the same or equivalent position and the voyage resumed thereafter. Any other extra expenses incurred shall be for the Owners' account.

CLAUSE 47
The Owners are permitted to use the Charterers' agents at loading and discharging for normal husbandry matters, such as the crew mail and communications between Owners/vessel, providing no additional expenses for the Charterers are incurred. However, for matters such as, but not limited to, repatriation, hospitalization, spare parts, victuals etc., the Owners are to appoint their Owners' agents.

CLAUSE 48 - Bunker Clause
(A) The Charterers on delivery, and the Owners on redelivery, shall take over and pay for all fuel and gas oil remaining on board the vessel as hereunder.

The vessel shall be delivered with about 20 metric tons of high sulphur IFO at the price of US$ 580.00 per metric ton and about 55 metric tons low sulphur IFO at the price of US$ 630.00 per metric ton and about 50 metric tons low sulphur gas oil at the price of USD 1,170.00 per metric ton and to be redelivered with about same quantities as on delivery, but always sufficient quantities to reach nearest main bunkering port after redelivery.

Same prices to apply on redelivery.

(B) The Charterers shall supply bunkers of a quality suitable for burning in the vessel's engines and auxiliaries and which conform to the specification(s).

Time Charterers to supply fuels of such specification(s) and grades to permit he vessel, at all times to comply with the maximum sulphur contents requirements of any emission control zone when the vessel is ordered to trade within this zone.

The Owners reserve their right to make a claim against the Charterers for any damage to the main engines or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed specification(s) or otherwise prove unsuitable for burning in the vessel's engines or auxiliaries , the Owners shall not be held responsible for any reduction in the vessel's speed performance and/or increased bunker consumption, nor for any time lost and other consequences.

Bunker quality:
Master/Chief Engineer to satisfy prior commencement of bunkering of quality to be supplied and to always retain 1 sample on board for verification. Any quality claims of substandard fuel to be notified to bunker supplier and Charterers within 72 hours of bunkering, otherwise any claim to be void.

All bunkers to be delivered with clear acknowledgement of the bunkering company that the bunkers is ordered and is for account of Time Charterers Messrs. Martrade. Master will clause all bunkers receipt accordingly. Charterers to present evidence (swift) for payments.

CLAUSE 49
In the event of loss of time due to boycott of the vessel by shore labour or due to government restriction of if recommendations, all caused by reason of the terms and conditions on which the crew members are employed, payment of hire shall cease for the time thereby lost and the Owners to reimburse the Charterers any expenses caused thereby.

CLAUSE 50
The Charterers may deduct from the semi-monthly hire any amount disbursed for Owners' account and supported by vouchers or necessary proof. The Charterers may deduct from the last payment of hire the value of bunkers' estimated on board on redelivery and estimated expenses incurred by the Charterers for the Owners' account, for which, however, vouchers have not yet reached the Charterers for submission to the Owners provided such expenses paid on behalf of the Owners with the Owners' previous concern/ approval.

All balances including Final Hire Statement to be closed latest 4 months after vessel's redelivery.

CLAUSE 51
Deleted.

CLAUSE 52
The Charterers shall not be liable for loss of life, nor personal injury or arrest or seizure or loss or damage to the vessel, her cargo and/or other objects arising from the perils insured against by the customary policies of insurance.

CLAUSE 53
The Owners guarantee that the vessel is always safe in ballast without solid ballast being required. The Owners further warrant that the vessel is eligible for bunkers' areas within the agreed trading limits.

The vessel shall comply with any local, national or international regulations regarding water pollution.
The vessel also to possess and carry on board a certificate of financial responsibility (oil pollution).

CLAUSE 54 - Bill of Lading
The Charterers are allowed to use their own Bill of Lading form respectively Liner Bills of Lading (CONLINE) in order to follow the requirements of the liner trade.

In above case Charterers are to be inserted as Carriers in the Bills of Lading and same to be signed "for and on behalf of the Carrier Martrade".

In the event of Sub Charter, on behalf of the actual Sub Charterers - Carrier, in which case Messrs. Martrade to remain ultimately responsible as Head Charterers.

Charterers remain fully responsible for all consequences that might result from using such forms and Liner Bills of Lading.

Charterers herewith confirm that in case of Liner Bills of Lading issued all liner costs involved are for Charterers' account and that such cost are being paid to the respective port timely and agents to confirm same towards Owners upon request.

For all other Bills of Lading (except Liner Bills of Lading) Charterers will use BIMCO/ASBA approved forms only. In these forms original Owners may be inserted as Carriers.

The Master is to sign Bill(s) of Lading for cargo as presented in conformity with Mate's Receipts. In case of remarks regarding condition of the cargo Master to insert the remarks on Mate's Receipts and Bills of Lading. Draft Bill(s) of Lading to be provided for Owners' approval prior to be signed for which

PIC - Ship's Operator
Kamen Terziev
aoh/mobile +359 887517746 SHINC
email ncl@bc.navbul.com can be monitored SHINC with Charterers' prior notice during working days.

CLAUSE 54 / CONTINUED
Alternatively - the Master of the vessel is also Navibulgar employee, who can deal with draft Bill(s) of Lading.

Master and Owners can authorise Charterers or their agents to sign Bill(s) of Lading in conformity with Mate's Receipts. In case of remarks regarding condition of the cargo Master to insert the remarks on Mate's Receipts and same remarks to be inserted on Bill(s) of Lading. Draft Bill(s) of Lading to be provided for Owners' approval prior to be signed. No Letter of Indemnity for Clean on Board Bill(s) of Lading accepted.

Delivery of the Cargo and Change of Destination:
In case of non-availability of original Bills of Lading upon vessel's arrival at discharge port, the Owners to allow the discharge of the cargo against a Letter of Indemnity in Owners' standard P&I wording which being signed by the Charterers Martrade only and Charterers Martrade assuming the full liability for such discharge.

For change of destination the same procedure to be followed as per above and against a Letter of Indemnity in Owners' P&I wording signed the Charterers Martrade only.

CLAUSE 55
The Owners warrant that vessel is suitable for grab discharge.

CLAUSE 56
All references to time are understood to be in GMT.

CLAUSE 57 - Cargo exclusions
The vessel to be employed for carriage of mainly metal/steel, general cargo, bulk minerals, ores, concentrates, chemicals, non-dangerous, harmless, lawful cargoes and containers. Deck cargoes, if any to be at Charterers'/Shippers'/Receivers' risk and expenses. Bills of Lading to be marked accordingly.

Charterers may carry up to 5 laden legs with bulk cargoes for the duration of the Charter, with Master's prior consent as to the exact bulk cargo. When loading bulk cargoes, then the tweendecks to remain open and Charterers to cover all vital part of the tweendeck covers.

All kind of grain cargoes or cargoes whose behaviour is similar to that of grain to be carried in accordance with SOLAS; grain code; vessel's stability booklet; local regulations; local authorities approved cargo plan; Master's cargo plan recommendations/requirements always to be followed. Charterers are fully aware vessel is not grain fitted and bagging and/or strapping is required.

Cargo exclusions - the following cargoes are excluded from carriage.
asphalt, arms, ammunitions, acids, asbestos, black powder, bones, copra and/or its products, creosoted goods, bulk cement, clinker, calcium carbide and hip chloride, caustic soda, detonator, caps, direct reduced iron/iron ore briquettes, explosives of any kind, hides, fish meal, livestock, manioc and/or manioc pellets, scrap of all kinds, naphtha, nuclear and radioactive materials/products and/or waste, Niger seed, oil cakes, sponge iron/pre-reduced iron ore pellets, tar and/or its products, turpentine, pitch, petcoke, petroleum or petroleum products, pyrites, sulphur, sunflower seed expellers and pellets, linseed expellers and pellets, seed cake, inflammable, dangerous and hazardous goods not corresponding to ship's certificates.

Charterers are allowed to load all IMO cargoes according to valid vessel's certificate (except those stated above), of course provided vessel has the corresponding certificate, but arms, ammunitions, explosives etc. listed above remain excluded.

CLAUSE 58
The Charterers to have full use of vessel's radio/telex/fax/mail communication. Owners will arrange direct email transfer between vessel and Charterers. Charterers to pay for such usage per 30 days (month) pro rata and to be paid with vessel' hire (see Clause 66 - it is part of item cables/representations/victualling US$1,300.00 per month (30 days) - pro rata).

CLAUSE 59
Trading exclusions (war risk insurance)
Trading always within I.W.L., always afloat via safe ports, safe berths, safe anchorages excluding St. Lawrence, Cuba, Israel, Iraq, Libya, Lebanon, Cabinda, Amazon River (but Belem and Vila do Conde allowed), Orinoco River trade permitted, however, deep sea pilot to be for Charterers' account, Eritrea, Nigeria, Cape Horn transiting, Hudson Bay, Turkish occupied Cyprus, Syria, Somalia, North Korea, Pacific coast of Russia, any war risk area and any warlike zones, any country where the U.N. decides to boycott or ban the trade, no direct trading between China and Taiwan and between Turkey and Cyprus, Mindanao, between the ports of Polloc Harbour and Mati included.

Charterers are allowed to trade the vessel via Magellan Strait, however, Charterers to cover full/entire pilotage/navigation charts at their cost/expenses even though pilotage is non-compulsory, but recommended only.

Iran and Sierra Leone are allowed provided that Security Guards to be as per ISPS Clause, however, watchmen to be for Charterers' account.

Vessel not be ordered to breach ice, to enter or leaving any ice port. Any time lost and extra expenses that may have occurred due that fact will be at Charterers' responsibility/account.

Charterers' option to breach IWL 1/7/76 and extra war risks listed areas of Joint War Committee, hull war, strikes, terrorism and related perils, but always against Owners' preliminary confirmation/agreement, which not to be unreasonably withheld and reimbursement of extra insurance premium according to the London Underwriters.

Should the vessel trade in an area for which the Owners' war risk insurance require additional premium, the resulting cost to the Owners of maintaining in force their war risk insurance cover and of any crew war bonus payment until the vessel leaves such an area to be for the Charterers' account, but in accordance with London scale. The Charterers are to reimburse the Owners for such premiums and bonus payments upon submission of invoices and supporting vouchers. Instructions of the Owners' underwriters to be always followed.

Following clause to apply for:
for African countries (excluding South Africa) and Yemen; Saudi Arabia; Jordan, Pakistan and Myanmar and is valid for all permissible cargoes under this Charter Party.

On completion of discharging at any port called under this Time Charter Party - Charterers to arrange vessel's departure without delay. Charterers undertake to hold Owners harmless against any claim, seizure etc., which may arise by the Receivers' side or any third parties including custom office and/or local court procedure for short landed or damaged during discharging cargo, detention and/or arrest thereof, bank guarantee, direct payment of the claimed amount to the receivers. Vessel to remain always on-hire.

CLAUSE 60
Deleted.

CLAUSE 61
All taxes and dues on the vessel and/or cargo and on Charterers' hire and on freight all of which arising of cargoes carried to ports visited under Charter Party shall be for Charterers' account.

CLAUSE 62
War Risk Clause Conwartime 2004 to apply, Chamber of Shipping Nuclear Clause, New Jason Clause, New Both-to-Blame Collision Clause, Bulk Carrier Safety Clause, ISPS/MTSA Clause for Time Charter 2005, Clause Paramount to be incorporated in this Charter Party. All Bills of Lading issued under this Charter Party to contain the same clauses: General Average, if any, to be settled in accordance with York/Antwerp rules 1994. Hire shall not contribute to General Average.

CLAUSE 63
Deleted.

CLAUSE 64
Deleted.

CLAUSE 65
The Officers' and crew's services including overtime work cover

- opening and closing of hatches
- removing and replacing all beams
- maintaining power for cargo operations
- provided situation permits:
  shaping up hatches and cranes in order to commence cargo operations immediately on arrival at a berth of place;
  cleaning of holds for next loading;
  all nautical duties necessary for safe navigation day and night, Sunday and holidays included;
  supervision of stowage, tallying and putting necessary remarks in the Mate's receipt and Time sheets, attending to deck cargo and its lashing whilst at sea;
  warping alongside berth, if permitted by local authorities.

CLAUSE 66
The hire of US$ 11,050.00 daily including overtime, luboil, freshwater to be payable every 15 days in advance into Owners' nominated bank account. First advance 15 days hire and bunker on board on delivery must be paid by Charterers within 3 (three) banking days upon delivery.

Cables/representations/victualling US$ 1,300.00 per month (30 days) or pro rata (Owners will arrange direct email transfer between vessel/Charterers).

CLAUSE 67 - Withdrawal Clause
Where there is a failure to strictly follow the terms and conditions of the Charter Party, which could be considered as a fundamental breach of this Charter Party and/or where is a failure to make a punctual and regular payment of the hire due to oversight, negligence or omissions on the part of the Charterers or their bankers the Owners shall be at liberty to withdraw the vessel from the service from the Charterers without prejudice to any claim they (the Owners) may otherwise have on the Charterers.

The Charterers shall be given by Owners 7 clear banking days written notice to rectify the failure and when so rectified following the Owners notice the performance and the payment shall stand as regular and punctual.

At any time after the expiry of the grace period as provided above and while the failure in performance and/ or hire payment is not rectified the Owners without prejudice to the liberty to withdraw, be entitled to withhold the performance of any of their obligations under the Charter Party and shall have no responsibility towards the Charterers whatsoever.

CLAUSE 68
The Charterers have the liberty to retain sufficient funds from the last hire payment in order to cover Owners' disbursements as well as estimated bunkers remaining on board on the time of redelivery only after receipt of Owners' confirmation of amount of these funds. The settlement of final accounts shall be made upon receipt of vouchers from the ports of calls.

CLAUSE 69
Deleted.

CLAUSE 70 - Vessel's description

Vessel: M/V Teteven - as described

| | |
|---|---|
| Ship's Name: | Teteven |
| Imo Number: | 8915861 |
| Head Owners: | Navigation Maritime Bulgare |
| Manager: | Navigation Maritime Bulgare |
| Operator: | Navigation Maritime Bulgare |

CLAUSE 70 / CONTINUED

| | |
|---|---|
| Flag: | Bulgarian |
| Port of Registry: | Varna |
| With the character of Class: | BR 100 A5 Ice 1 General Cargo |
| Type of the vessel: | General Cargo Vessel |
| Inmarsat Tlx Nr/Ind: | C(1)-420705710,C(2)-420705711 |
| Fleet77: | Voice 761673422 |
| Fax: | 761673428 |
| Globe Wireless: | Lzdj@globeemail.com |
| Call Sign / Mms I: | LZDJ / 207057000 |
| Year of build: | 1990 |
| Last dry dock: | December 2005 |
| Next dry dock: | May 2008 |
| Last special survey: | December 2005 |
| Next special survey: | December 2010 |
| Gt/grt: | 7098 |
| Nr/nrt: | 3205 |
| British Tonnage Certificate | not applicable |
| Panama | grt: nrt: |
| Suez | grt: 7693.71 nrt: 5670.18 |
| Suez projector: | No |
| Deadweight capacity: | 8637 |

Non cargo weights deducted from the 'deadweight' capacity:

| | |
|---|---|
| Deadweight constant: | 150 tons |
| Anti healing System | 240 tons (Vessel to trade with anti healing system full) |

Unpumpable:

| | |
|---|---|
| ballast | 52 metric tons (at trim 1.5 aft) |
| heavy fuel oil | 54 cubic meter (at trim 0.0) |
| marine gas oil | 8 cubic meter (at trim 0.0) |

| | |
|---|---|
| L.o.a.: | 122.335 meters |
| Breadth: | 20.00 meters |
| Max draft on summer load line: | 8.13 meters |

Draft on full ballast water:
1. With 10 pct bunker - 3.86 meters ; 5.63 meters

Freshwater allowance: 172 mm

| Draft scale (dm) | deadweight (m.ts.) | (t/cm) |
|---|---|---|
| 36.00 | 748 | 16.27 |
| 38.00 | 1075 | 16.31 |
| 40.00 | 1403 | 16.37 |
| 42.00 | 1732 | 16.42 |
| 44.00 | 2062 | 16.48 |
| 46.00 | 2393 | 16.53 |
| 48.00 | 2725 | 16.58 |
| 50.00 | 3059 | 16.64 |

CLAUSE 70 / CONTINUED

| | | |
|---|---|---|
| 52.00 | 3393 | 16.70 |
| 54.00 | 3729 | 16.75 |
| 56.00 | 4067 | 16.85 |
| 58.00 | 4406 | 16.97 |
| 60.00 | 4748 | 17.11 |
| 62.00 | 5094 | 17.27 |
| 64.00 | 5443 | 17.43 |
| 66.00 | 5796 | 17.64 |
| 68.00 | 6153 | 17.88 |
| 70.00 | 6513 | 18.17 |
| 72.00 | 6882 | 18.39 |
| 74.00 | 7254 | 18.60 |
| 76.00 | 7629 | 18.79 |
| 78.00 | 8008 | 18.97 |
| 80.00 | 8391 | 19.15 |
| 82.00 | 8777 | 19.31 |
| 84.00 | 9166 | 19.47 |
| 86.00 | 9559 | 19.63 |

height from keel to mast top: 40.80 meter

summer loadline freeboard: 2262 mm

number of holds: 3
number of hatches: 3

| holds dimensions: | length | x | breadth | x | height | |
|---|---|---|---|---|---|---|
| hold 1 | 10.50 | x | f- 5.20 / a-11.40 | x | 3.95 | meter |
| twd 1 | 14.00 | x | f- 7.20 / a-14.50 | x | 5.50 | meter |
| hold 2 | 31.40 | x | f-11.60 / a-15.50 | x | 4.58 | meter |
| twd 2 | 31.50 | x | 17.50 | x | 4.85 | meter |
| hold 3 | 30.00 | x | 15.50 | x | 4.58 | meter |
| twd 3 | 31.50 | x | 17.50 | x | 4.85 | meter |

tweendeck's hatch dimensions:
No. 1 8.40 x 6.50 meter
No. 2 25.50 x 15.50 meter
No. 3 25.50 x 15.50 meter

cargo hold's hatch dimensions:
no 1 7.67 x 6.50 meter
no 2 25.40 x 15.50 meter
no 3 25.50 x 15.50 meter

| capacity | grain | / | bale (cubic meter) |
|---|---|---|---|
| hold 1 | 507 | / | 474 |
| twd 1 | 823.8 | / | 807.7 |
| hold 2 | 2,215.6 | / | 2,215.6 |
| twd 2+3 | 2,684 + 2,699 | / | 2,643 + 2,649 |
| hold 3 | 2,179.25 | / | 2,179.2 |
| total | 11,109.78 | / | 10,960.0 |

CLAUSE 70 / CONTINUED

capacity - (m²):

| | |
|---|---|
| hold 1 | 87 |
| tweendeck 1 | 122 |
| tweendeck 2 | 597 |
| hold 2 | 472 |
| tweendeck 3 | 598 |
| hold 3 | 459 |
| total | 2,335 |

| | |
|---|---|
| tanktop | -15.0 t/m2 |
| tweendeck | - 3.66 t/m2 / tw 1 - 4.31 t/m2 |
| hatch covers | - 1.75 t/m2 |

self blending wing tanks capacity - grain (m³) - nil
cargo battens: no
vessel can load concentrated ores at a hold interval: no
maximum loading on main deck t/m²: 1.46 t/m²

| | |
|---|---|
| number of cargo handling gears: | 2; not combinable |
| type: | electro-hydraulic |
| outreach: | no 1 - 8 meter ; no 2 - 6 meter |
| load capacity: | 40.00 metric tons |

not combinable
the proper work of cranes given in atmospheric temperature up to 35 degrees Celsius

number of hatches served by one crane: 2
number of hatches served by two or more cranes: 1
number of cranes fitted with grabs: no
flush deck: no

type ventilation: electrical driven, non reversible, suction
- cargo spaces: all
- service spaces: all
- accommodation spaces provided with air conditioner: all

length between fore end of the first hatch coaming and aft end the last hatch coaming: 69.0 meter

location of engine room and bridge: aft part - stern frames no 9-39

length from fore part of superstructure to stern: 32.9 meter

length between forecast and superstructure: 89.2 meter

stretch between board and hatch coaming
first: 3.00 meter middle: 0.80 meter last: 0.80 meter

vessel is fitted to load cement: no
vessel is CO2 fitted
vessel is equipped with Australian ladders: no
vessel seaway fitted: nil
vessel lakes fitted: nil
vessel is fitted to load containers: yes
vessel comply with I.T.F. requirements:

max loading on top tanks: 15 metric tons/m²

CLAUSE 70 / CONTINUED
vessel is container fitted with following intakes:
max weight holds for stack
20' - 81.2 tons
40' - 122.0 tons

max weight upper deck for stack
20' - 22.0 tons
40' - 30.0 tons

as per available lashing material on board
max 384 TEU - empty
255 x 20' x 14 tons including refrigerators - 30 pieces

Panama fairlead: yes
main engine - type: MAN & BW 8l35mc
built in: Poznan, Poland
year: 1987

number of main engines: 1 output mts /day / rw 4472 kw

recommended fuel: IFO 180

IFO tanks:
dbt 5 port - 322.27 cbm - assigned for low sulphur fuel oil
dbt 5 starboard - 330.10 cbm

Vessel not fitted and equipped with separate fuel system for low sulphur fuel oil.
Time for change from "HSFO" to "LSFO" based on "Lloyd's change over calculator" and depends on sulphur content of the "LSFO", and remains in daily tanks.

Time charterers to supply fuels of such specifications and grades to permit the vessel ,at all times to comply with the maximum sulphur content requirements of any emission control zone when the vessel is ordered to trade within this zone

Main engine (rpm = 200 = const)

| | rpm 200 / speed / IFO daily consumption | metric tons/day | kg / hour |
|---|---|---|---|
| Regime 1 | | | |
| ballast | 0.0 | 0.0 | 0.0 |
| laden | 11.2 | 16.0 | 667 |

with shaft generator in service / normal regime of work

| | | | |
|---|---|---|---|
| Regime 2 | | | |
| ballast | 0.0 | 0.0 | 0.0 |
| laden | 11.0 | 14.4 | 600 |
| Regime 3 | | | |
| ballast | 0.0 | 0.0 | 0.0 |
| laden | 9.8 | 12.0 | 500 |

* speed granted in good weather Beaufort scale wind up to 4 and sea state/swell up to including 3. Sea water temperatures not exceeding 26 degrees/Celsius on even keel.

*using of shaft generator in bad weather condition to be to Master's discretion.

CLAUSE 70 / CONTINUED
consumption manoeuvre
main engine usual fuel
HFO - IFO: 350 kg/hour mix: - go: 350 kg/hour 8.4 metric tons/day

when a forthcoming repair over main engine uses the gas oil - 350 kgs/h

| | | |
|---|---|---|
| auxiliary engine consumption (1, 2, 3) | Gas Oil | 105 |
| - sea consumption / without shaft generator | Gas Oil | 45 |
| - manoeuvring (two) | Gas Oil | 2 x 50 |
| - air condition in use | Gas Oil | 62.5 |
| - port consumption | Gas Oil | 62.5 |
| - crane in use | Gas Oil | 2 x 50 |
| being at anchor and in port | about 2.5 metric tons MGO per day of 24 hours | |
| auxiliary boilers | IFO | 35 |
| at sea | MGO | 250 kgs/24 hrs |
| vessel's heating | IFO | 35 |

MGO
1 DG - 1.25 tons/24 hours
2 DG - 2.5 tons/24 hours

unpumpable quantities
IFO about 54 tons/even keel
MGO about 11.5 tons

*as per following international standards

ISO 8217-1996 CIMAC
BS MA 100:1989
IFO 180 RME 25 E 25
RMF 25 F 25
GO DMA MGO

| | |
|---|---|
| daily fresh water consumption: | 5.0 |
| mix: | 0.0 |
| go: | 0.0 |
| capacity of freshwater tanks: | 188 metric tons |
| capacity of bunker tanks IFO: | 638 m³ |
| evaporator daily capacity: | 4.0 metric tons |

Vessel can, but not suitable for loading bulk cargoes if stowage factor bigger than 0.75 m³ per ton due to:

1. Each loading when cargo is above the tween deck level requires grease remove and chemical cleaning of the cogged rails and tween deck mechanisms. The oily mixtures must be collected and delivered ashore. Cleaning must be done with small quantities of water not to overflow the bilge tank capacity.

2. Tween deck covers mechanism liable to damage if bulk loaded continuously.

CLAUSE 70 / CONTINUED

3. If bulk loaded above the tween deck level, due/depends on stowage factor and angle of repose of the cargo, consider minimum 600 metric tons of bulk will not seep from its own gravity and will remain for manual/shovel discharge over side tanks ant opened covers in the tween decks no. 2 and 3.

4. Due to type and way of detection all smoke detectors in the tween decks must be isolated from dust, always remaining in non detecting condition (contradiction with "SOLAS"), liable to damage and getting soon inoperative.

All details "about"

CLAUSE 71
Charterers are to supply Owners with full style of agents of ports of call and straits before vessel's arrival.

CLAUSE 72
Charterers to present to Owners confirmation of payments of disbursements and bunkers received by agents and by suppliers or with swift copies not later than 45 days from the date of sailing from respective port or from the date of delivery of bunkers.

CLAUSE 73
Deleted.

CLAUSE 74
Vessel's gear and all other equipment must comply with international rules and class registry association and Owners are to ensure that vessel is at all time possession of valid up to date certificate of efficiency.

If other countries introduce similar legislation the Owners to take appropriate action. Owners further warrant that such certificate of financial responsibility will remain valid throughout the terms of this Charter Party.

In the event of any loss of time of detention to the vessel due to failure to comply with the warranties contained in this clause, hire shall cease for the time lost thereby.

Owners guarantee that vessel will not change Ownership during this Time Charter. Vessel will not be sold for scrap after this Time Charter.

CLAUSE 75
Vessel's hatchcovers to be in good condition, otherwise all loss of time of expenses resulting from inadequacy to be borne by Owners. Hatchcovers to be watertight. Charterers' option to carry out hydro test and/or hose test and/or ultrasonic test.

CLAUSE 76
All mandatory pilotage(s) expenses to be for Charterers' account. It is agreed that if Master decides to take pilot at Great Belt same to be for Charterers' account.

CLAUSE 77
From the date of coming info force of the international safety management (ISM) code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and the company (as defined by the ISM code) shall comply with the requirements of the ISM code.

CLAUSE 78 - Container's Clause
Securing the cargo inside the containers and/or other unit load shall be entirely the Charterers concern and responsibility. Any damage to the vessel, her tackle furniture or anything else resulting from insufficient securing of cargo within containers and/or other unit load shall be repaired at the Charterers' expenses and time.

CLAUSE 79 - U.S. Customs Advance Notification/AMS Clause for Time Charter Parties

(a) If the vessel loads or carries cargo destined for the US or passing US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

(i) have in place a SCAC (Standard Carrier Alpha Code);
(ii) have in place an ICB (International Carrier Bond);
(iii) provide the Owners with a timely confirmation of (i) and (ii) above; and
(iv) submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnity, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any Bill of Lading, other contract, law or regulation.

CLAUSE 80

Preloading/pre-discharging surveys:

Whenever a cargo of steel is to be carried for which a preloading and pre-discharging survey is prudent and required by due diligence, surveyors and cost to be mutually agreed and costs to be shared 50/50 between Owners and Charterers.

In all other cases similar surveys (such as draft surveys) to be mutually agreed.
Reimbursed survey costs by underwriters to be shared 50/50 between Owners and Charterers.

CLAUSE 81 - Stowaways Clause for Time Charters

(a) (i) The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining access to the vessel by means of secreting always in the goods and/or containers shipped by the Charterers.

(ii) If, despite the exercise of due care and diligence by the Charterers, stowaways have gained access to the vessel by means of secreting away in the goods and/or containers shipped by the Charterers, this shall amount to breach of charter for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them. Furthermore, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account and the vessel shall remain on hire.

(iii) Should the vessel be arrested as a result of the Charterers' breach of charter according to sub-clause (a) (ii) above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the vessel is released and at their expense put up bail to secure release of the vessel.

(b) (i) If, despite the exercise of due care and diligence by the Owners, stowaways have gained access to the vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Owners' account and the vessel shall be off hire.

CLAUSE 81 / CONTINUED

(ii) Should the vessel be arrested as a result of stowaways having gained access to the vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable time, the vessel is released and at their expense put up bail to secure release of the vessel.

Crew efforts:
Prior to departure from ports which are high risk areas like Africa, south and Central America Caribbean Master to have a preventive measure in place like sailing lockers and access entry ways to the ship. Prior departure crew to search vessel for possible stowaways and such search to be noted in vessel logbook. Such searches at Charterers' time.

CLAUSE 82
U.S. Customs-Trade Partnership Against Terrorism (C-TPAT) Clause

The Charterers have voluntarily signed the C-TPAT Agreement with the U.S. Customs Service. The Owners, Master and Crew will use reasonable efforts to assist the Charterers to comply with their obligations under the C-TPAT Agreement. However, under no circumstances shall the Owners, Master and crew be liable for any delays, losses or damages howsoever, arising out of any failure to meet the requirements of the C-TPAT Agreement signed by the Charterers.

The Charterers agree to indemnify and hold the Owners, Master and crew harmless for any claims made against the Owners, Master and crew or for any delays, losses, damages, expenses or penalties suffered by the Owners arising out of the C-TPAT Agreement signed by the Charterers.

CLAUSE 83
US Securing clause for Time Chartering
If the vessel calls in the United States, including any U.S territory, the following provisions shall apply with respect to any applicable security regulations or measures: Notwithstanding anything else contained in this Charter Party all costs or expenses arising out of or related to security regulations or measures required by any U.S authority including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspection, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence.

CLAUSE 84 - Paramount Clause General
The International Convention for the Unification of Certain Rules of Law relating to Bills of Lading signed at Brussels on 25 August 1924 ("the Hague Rules") as amended by the Protocol signed at Brussels on 23 February 1968 ("the Hague Visby Rules") and as enacted in the country of shipment shall apply to this Contract. When the Hague-Visby Rules are not enacted in the country of shipment, the corresponding legislation of the country of destination shall apply, irrespective of whether such legislation of the country of destination shall apply, irrespective of whether such legislation may only regulate outbound shipments.

When there is no enactment of the Hague-Visby Rules in either the country of shipment or in the country of destination, the Hague-Visby Rules shall apply to this contract save where the Hague Rules as enacted in the country of shipment or if no such enactment is in place, the Hague Rules as enacted in the country of destination apply compulsorily to this contract.

The Protocol signed at Brussels on 21 December 1979 ("the SDR Protocol 1979") shall apply where the Hague-Visby Rules apply, whether mandatorily or by this Contract.

The Carrier shall in no case be responsible for loss of or damage to cargo arising prior to loading, after discharging, or while the cargo is in the charge of another carrier, or with respect to deck cargo and live animals.

General Average
General Average shall be adjusted, stated and settled according to York-Antwerp Rules 1994, in London unless another place as agreed in the Charter Party.

CLAUSE 84 / CONTINUED
Cargo's contribution to general average shall be paid to the carrier, even when such average is the result of a fault, neglect or error of the Master, Pilot or crew.

New Jason Clause
In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the goods, Shippers, Consignees or Owners of the goods shall contribute with the Carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving s hip is owned or operated by the Carrier, salvage hall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, Shippers, Consignees or Owners of the goods to the Carrier before delivery.

Both-to-Blame Collision Clause
If the vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in the management of the vessel, the owners of the cargo carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her Owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying Vessel or Carrier. The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact.

Bulk Carrier Safety Clause
(a) The Charterers shall instruct the Terminal Operators or their representatives to co-operate with the Master in completing the IMO Ship/Shore Safety Checklist and shall arrange all cargo operations strictly in accordance with the guidelines set out therein.

(b) In addition to the above and notwithstanding any provision in this Charter Party in respect of loading/ discharging rates, the Charterers shall instruct the Terminal Operators to load/discharge the Vessel in accordance with the loading/discharging plan, which shall be approved by the Master with due regard to the vessel's draught, trim stability, stress or any other factor which may affect the safety of the vessel.

(c) At any time during cargo operations the Master may, if he deems it necessary for reasons of safety of the vessel, instruct the terminal operators or their representatives to slow down or stop the loading or discharging.

(d) Compliance with the provisions of this Clause shall not affect the counting of laytime

ISPS/MTSA Clause for Time Charter Parties 2005
(a) (i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

CLAUSE 84 / CONTINUED

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b) (i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the Charter Party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners.

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measured required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

CLAUSE 85
War Risks Clause for Time Charters, 2004 (Code name: Conwartime 2004)

(1) For the purpose of this Clause, the words:

(i) "Owners" shall include the Shipowners, Bareboat Charterers, Disponent Owners, Managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii) "War Risks" shall include any actual, threatened or reported:
war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(2) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any water-way or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as afore said, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

CLAUSE 85 / CONTINUED

(3) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain fags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents' right of search and/or confiscation.

(4) (i) The Owners may effect war risk insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and Indemnity Risks), and the premiums and/or calls therefore shall be for their account.

(ii) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, which ever occurs first.

(5) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, which ever occurs first.

(6) The Vessel shall have liberty:-

(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(7) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(8) If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

CLAUSE 86 - Chamber of Shipping Nuclear Clause - amended
Notwithstanding any provision whether written or printed contained in this Charter Party, it is agreed that nuclear fuels or radioactive waste or products are specifically excluded from the cargo permitted to be loaded or carried under this Charter Party. This exclusion does not apply to radio isotopes used or intended to be used for any industrial, commercial, agricultural, medical or scientific purpose, provided Owners' prior approval has been obtained to the loading thereof.

Under no circumstances shall Charterers load non-excepted matter as defined in the Nuclear Installation Act 1965 of the United Kingdom or any regulation made there under.

"Any Nuclear cargo which is to be loaded by the Charterers' must be reported to the Club so that they can check with the International Group Nuclear Cargo expert in order to establish whether or not such cargo is excepted or non-excepted matter under the Act".

CLAUSE 87 - Double Banking Clause

(a) The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transhipment, loading or discharging of cargo and/or bunkering.

(b) The Charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this Clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.

(c) Without prejudice to the generality of the Charterers' right under (a) and (b), it is expressly agreed that the Master shall have the right to refuse to allow the vessel to perform as provided in (a) and (b) if in his reasonable opinion it is not safe so to do.

(d) The Owners shall be entitled to insure any deductible under the vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the vessel's Underwriters and/or the cost of insuring any deductible under the vessel's hull policy.

(e) The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The vessel shall remain on hire for any time lost including period for repairs as a result of such operation.

CLAUSE 88
The Owners guarantee that the vessel shall be fully fitted for Panama-/Suez Canal transit and in possession of valid necessary certificates during the currency of this Charter to comply with the current regulations and requirements of both canals.

CLAUSE 89
Owners are obliged to deliver and keep the vessel, her crew supplied with up to date and complete certificates, approvals and equipment as stated into vessel's description clause. Charterers are fully aware that the vessel not in possession of strapping equipment enabling the vessel and her crew rendering service as per Clause 65 to load, carry and discharge all permissible cargoes under this Charter Party and bunkers within the trading limits allowed under this Charter Party. It is the responsibility of the Master and Owners to arrange for any special vaccination required at ports of call and to keep on board corresponding valid certificates. Failing this, any time lost and all extra expenses, to be for Owners' account.

CLAUSE 90
Vessel must be in possession of a valid gear certificate for calling Indian ports and if vessel is over 15 years of age, vessel also to be in possession of a valid Saudi Arabian gear certificate.

Valid certificates must be on board for inspection at all ports of call.

CLAUSE 91
Australia and New Zealand are included in the trading areas under this Charter Party and Owners undertake that prior to delivery and throughout the currency of this Charter Party the vessel complies with hold ladder construction and gear/equipment certification requirements as stipulated at any time in the respective ports.

CLAUSE 92
If one Clause or part of a clause is void for any reason whatsoever this should not affect the entire contract, but should be restricted to just that clause or the part thereof.

********************************************

# EXHIBIT

# 2

pre-final hire $115.646,03

MARTRADE DUSSELDORF HIRE STATEMENT

TETEVEN <VESSEL C/P DATE> 00.01.1900

FILE NUMBER > 8026
HIRE RATE > $15.350 OWNERS> 0
TTL HIRE COMM %> 3,75 BROKERS> 0

06.07.2008 00:01 <FROM DATE/TIME LT (+ or -)> +0,0 <HRS DIFF. = 06.07.2008 00:01 GMT
10.10.2008 19:00 <TILL DATE/TIME LT (+ or -)> +0,0 <HRS DIFF. = 10.10.2008 19:00 GMT
GROSS T/C DURATION > 96,790972 < DAYS GROSS TOTAL

| | | | | CREDIT OWS |
|---|---|---|---|---|
| 4,104167 < - DAYS OFF-HIRE (REF. DOC. 8026 SUMOF.XLS) | | | $60.636,50 | |
| 0,000000 < + DAYS EXTRA HIRE | | | | |
| NETT T/C > | 92,686806 DAYS @ | | $15.350 > | $1.422.742,47 |
| BALLAST BONUS (GROSS ) (IF ANY) | -----------> | -----------> | -----------> | $0,00 |
| | | | | v |
| AS PER MASTER BUNKERS ON DELIVERY | -----------> | -----------> | -----------> | $0,00 |
| 137,400 < MT MAIN | $0,00 | < COST/MT = $0,00 | | v |
| 11,500 < HS MT AUX. | $0,00 | < COST/MT = $0,00 | | v |
| 79,700 < LS MT AUX. | $0,00 | < COST/MT = $0,00 | | v |
| CLEANING HOLDS REDELIVERY UNCLEAN | -----------> | -----------> | -----------> | $2.100,00 |
| EXPENSES FOR CHARTERERS' ACCOUNT, AS LISTED BELOW | | | | v |
| C/V/E $1.300 | PER T/C | 30,42 | (=365/12) DAYS | $3.960,97 |
| class survey appointed by head-ows at huelva (BR) | | | | $1.087,50 |
| class survey appointed by head-ows at huelva (BR) | | | | $3.989,63 |
| ifo difference 23 mt x $488 | | | | $11.224,00 |
| go ls difference 49,377 mt x $1000 | - | 23,2 mt x $781 | | $67.496,20 |
| hs go difference -43,06 mt x $950 | | | | ($40.907,00) |
| INTERMEDIATE HOLD CLEANING | | | | $0,00 |

| LESS | | | | DEBIT OWS | |
|---|---|---|---|---|---|
| 3,75 % COMMISSION ON HIRE (+ BALLAST BONUS IF ANY) | | | -----------> | $53.352,84 | v |
| | | | | v | v |
| AS PER MASTER BUNKERS ON REDELIVERY | | -----------> | -----------> | $0,00 | v |
| 114,400 < MT MAIN | $0,00 | < COST/MT | $0,00 | | v |
| 54,560 < HS MT AUX. | $0,00 | < COST/MT | $0,00 | | v |
| 7,123 < LS MT AUX. | $0,00 | < COST/MT | $0,00 | v | v |
| PAID ON ACCOUNT | | | | v | v |
| $222.256,65 <1 7 > | $0,00 | | | v | v |
| $220.206,65 <2 8 > | $0,00 | | | v | v |
| $222.256,65 <3 9 > | $0,00 | | | v | v |
| $191.233,33 <4 10> | $0,00 | | | v | v |
| $209.754,71 <5 11> | $0,00 | | | v | v |
| $222.225,62 <6 12> | $0,00 | TOTAL PAYMENTS | -----------> | $1.287.933,61 | v |
| | | | | v | v |
| PROVISIONS/INVOICES FOR OWNERS' ACCOUNT | | | | v | v |
| OXP AS PER DOC 8026 SUMXP.XLS (INCL. | 0 | | % COMM) | $14.761,29 | v |
| BUNKERS/OFF-HIRE AS PER DOC | 8026 | SUMOF.XLS | -----------> | $0,00 | v |
| ON-HIRE SURVEY PROVISION | OFF-HIRE SURVEY | PROVISION | TOTAL OWS' A/C | $0,00 | v |
| PRESHIP SURVEYS TTL PROVISION 1 | PROVISION 2 | PROVISION 3 | PROVISION 4 | $0,00 | v |
| X | | | | $0,00 | v |
| X | | | | $0,00 | v |
| X | | | | $0,00 | v |
| X | | | | $0,00 | v |
| X | | | | $0,00 | v |
| X | | | | $0,00 | v |
| | | | | $0,00 | v |
| | | | | $0,00 | v |
| OLD BALANCE DUE CHRRS | | | | $0,00 | v |
| This zone not in bookpage | | | | $1.356.047,74 DEBIT OWS | $1.471.693,77 CREDIT OWS |
| pre-final hire $115.646,03 | DUE OWNERS | | | $115.646,03 | |

| 8026 SHIP.XLS | 02.12.2008 | 14:55 | $1.471.693,77 | = | $1.471.693,77 |
|---|---|---|---|---|---|